Ms. Chin Kaplan, when you're ready, you may proceed. Good morning. Good morning, Your Honor. May it please the Court, my name is Sylvia Chin Kaplan and I represent the appellant Marilyn Davis. We're here today seeking review of a decision of the Claims Court which affirmed a special master's denial of entitlement because the appellant had failed to provide medical literature to support the precise mechanism by how a flu vaccine caused her injury, neuromyelitis optica, which I will now henceforth call NMO. In this case, which is a surprisingly complex type of disorder, there is relatively little disagreement between the parties. The parties agree that NMO is an antibody-mediated type of injury as opposed to T cell, which is a cellular mediation. They agree that the target molecule is the aquaporin 4, and the aquaporin 4 is located in the areas primarily behind the eyes and the spinal cord, and that is where the petitioner her injury was the spinal cord. And they agree that, I should say that they do not disagree of the underlying mechanism by how this occurs. And this is by the testimony of appellant's expert, Dr. Steele, in which he indicated that it is well accepted that antibody-antigen reactions can deposit in the blood vessels and cause an immune cascade to occur, which leads to the exposure of this otherwise hidden protein. And when that protein is exposed, it then generates a cascade of other immune events, which leads to this disorder. I think, I thought that both experts or the government expert didn't dispute the antibody-antigen portion of the theory, but did disagree that the flu vaccine could disrupt the endothelium in the first place. If you don't have disruption of endothelium in the first place, then the flu vaccine can't be what triggers the antibody-antigen portion of the theory. So I don't, I think it would better serve you, if you don't mind, to move to that portion of the two-hit theory. Certainly, Your Honor. There was no dispute between the parties that the MRI demonstrated that there were holes in the blood-brain barrier. And when you have a hole in the blood-brain barrier, it exposes the aquaporin-4, because it is hidden behind the blood-brain barrier. Once exposed, that is what's known as what Dr. Steele called the first hit. But it's part of the immune process. It is one process. One can't necessarily separate out the initial immune reaction from the subsequent immune reaction. It just occurs. I guess the problem is the government expert didn't agree that those holes in the blood-brain barrier were caused by the flu vaccine. He affirmatively disputed that. You're correct, Your Honor. But what he wanted was, he wanted specific literature that indicated that the flu vaccine, the trivalent flu vaccine, led to this hole in the endothelium. And the requirement of objective literature was specifically rejected by this court in Althan. Now, when Althan issued its decision about the three prongs necessary for a petitioner to establish their case, what it expressly rejected was prongs two and three of the Stevens criteria, which Althan had gone up on appeal. Prongs two and three indicated that it was error for the respondent to require proof of medical plausibility via either scientific testimony or scientific literature. And then the Althan court also indicated that it was also error to require proof of injury by that medical plausibility theory. So in fact, this case represents an attempt by the special master to resurrect the discredited prongs two and three of Stevens. What is clear is that the Althan criteria governs here, and Althan indicates that petitioner must present a medical theory which is plausible, for which there is a logical sequence of cause and effect, and for which the temporal relationship is appropriate. Now, the temporal relationship was not in dispute here. And petitioners assert also that this court in Capizzano has indicated that one prong can be used to support another prong, and that the evidence must be based on the record as a whole, which indicates whatever the testimony of respondent's expert as well. As I understand it, you're arguing that a heightened standard was applied in evaluating the Althan prong one issue. It seems to me that this issue was answered already in the Moberly case and addressed directly. The same argument and the same analysis applies in that case. Hasn't this already been resolved? It has not, Your Honor. What Moberly indicated was that the court can require some indicia of reliability. And the appellant here asserts that that indicia of reliability is based on the underlying science and medicine for which there is no dispute. The respondent's expert did not dispute that it is known that antigen-antibody complexes form in the deposit on the blood vessels. Yes, but that, again, isn't where the area of dispute is. The area of dispute is the endothelium. So it doesn't matter if they say that they don't disagree with it, that hit number two is a possibility. You have to get there. And you were saying plausible, and that's the standard you think is right, but you were the counsel at Moberly, and you argued exactly that in Moberly, and the court expressly rejected that. So the test, as I understand it, from Moberly, this is a quote, is reputable medical or scientific explanation that pertains specifically to the petitioner's case, although the explanation need only be legally probable, not medically or scientifically certain, but not plausible. Legally probable. There's a difference between plausible and legally probable. There's a lot of ground in between those two. I would agree with you, Your Honor. However, in evaluating prong one, this court has indicated that the other prongs, two and three, can provide support for petitioner to establish the preponderance of the evidence. What support would the fact that there is an admitted temporal relationship give to these medical issues? You're talking like that. The temporal relationship is what is medically and scientifically appropriate. It is the time frame in which one would- The temporal relationship is if something happened to you within a relative time frame from the moment of the vaccination, right? That would be the literal temporal relationship, which this court has already indicated is not appropriate in establishing causation in these cases. What we're indicating is that from a scientific and medical standpoint- Do you think the third prong of health is something more than just a factual temporal time relationship between the moment that you had the vaccination and the moment that you had some reaction? Yes. This case law has indicated that what the court has just described is a literal mechanistic approach of when the vaccination occurred and when the injury occurred. There is no analysis about whether it is appropriate from a medical and scientific standpoint. And in this case, there was no dispute that it was appropriate from a medical and scientific standpoint. Can I say one thing about the Moberly discussion? The government in its red brief argued Moberly forcefully. And your great brief, as I read it, didn't even respond to Moberly. That's correct? Yes, that is correct. And then haven't you waived any argument that you could make here today- About whether- Can you try to explain why Moberly doesn't say what the government says it says? I mean, the short of the matter is that, in all fairness, if you have an argument to get away from Moberly, it should have showed up in your gray brief. And then the government would have come here prepared to be able to respond to you. And it seemed to me that if you're trying to get away from Moberly, you should have done it in the gray brief, not here. Those are the rules of engagement, I think. Yes, Your Honor. You are correct in that respect. Do you have any reason why the gray brief didn't address the government's Moberly argument? I don't, Your Honor. My partner wrote the brief, and I did not question him on that. I am responding to a question from the bench regarding why Moberly does not apply here. In response to that, I don't believe that we have waived that argument because I am, in fact, responding appropriately to a question presented by the court. And if the court raises it, then I believe that the oral argument would permit me to address it, and it hasn't been waived. So to continue, Your Honor, as we indicated, in Alton, there was very little dispute by the parties as to the underlying mechanism. And in Alton, those parties that responded also required objective medical literature to support the mechanism by how their injury occurred. And this court in Alton indicated that in this field, which is bereft of direct scientific evidence of how these injuries occur, that we are permitted to use circumstantial evidence. And the circumstantial evidence is based upon what is known and accepted in biology and medicine from which reasonable inferences can be drawn. And that is what our expert did. And this court further recognized that because there are no fine lines in medicine when it comes to diagnosis and when it comes to assigning causation, that if one prong strongly supports another prong, then it can be utilized to meet its burden of proof. I would be pleased to answer any questions that the court may have on this matter. All right. Thank you very much. We'll reserve your time for rebuttal. Thank you. Mr. Wishard. Good morning, Your Honor. Good morning. May it please the Court. Counsel. Government requests that you affirm Judge Lateau's decision in this case who affirmed the Special Master's decision denying entitlement. Both he and the Special Master in this case applied the correct legal standard under Section 13 of the Act, preponderance of the evidence. Both he and the Special Master used the Alton factors as a measure for Petitioner's burden of proof to meet her causation in fact case. As noted by Judge Lateau, Special Master lawfully used the Daubert factors as a guide to determine the reliability of the evidence to meet the burden of proof under Alton to find out whether it would be legally persuasive or legally probable. In applying these standards and giving deference to the Special Master in his role to weigh and evaluate the evidence, he found that the Special Master considered the relevant evidence, drew plausible inferences from it, and made a rational and lawful basis for his decision. Suppose that there were some additional authorities submitted. It's the Calise v. HHS case. I'll give you a chance to explain to me all the differences between the two in a second, but suppose they were identical, the cases were identical. The same two experts gave the same testimony in both cases. Our standard of review in this case for this issue of causation is what? Well, the standard of review based upon the briefs that have been filed, really the question before you is an error of law at this point in time. But nevertheless, in terms of the two different cases. The issue before us is a question of law. I thought the question before us was whether or not the Special Master and the Court of Federal Claims was correct in their determination that causation hadn't been established, and I thought that was a question of fact. Am I wrong? Well, it's a question of the application of the law to the fact in the case, which the Special Master here did. In terms of comparing Calise and looking at Calise, reasonable minds can differ on each case, and each case rises and falls on its own facts. Calise is different than this case. There are specifically several differences. Number one, it's a Special Master's decision. It's not binding on the other Special Masters. There's really no new discovered evidence here because the internal ---- I don't think you've answered Judge Moore's question, which I took to be what would happen if the cases were exactly the same. If the cases were ---- If the facts were exactly the same. The facts were exactly the same, and there were four different Special Masters. Each Special Master has the deference to look at the facts and determine or not whether it met the reliability standard and whether petitioners met the three-prong test under all of them. Wouldn't it be troubling to have two cases, if the testimony and causation were identical, come out opposite of each other, as these two cases did? I mean, that's why I'm trying to figure out what the standard of review is because certainly if it's de novo, then we can make sure that law applies equally to all of the petitioners. But if the standard of review is more deferential, then might I have to just stomach the idea of two different results? Well, the standard of review here is more deferential. It's not de novo. You're looking at whether the findings of fact are supported by the evidence. You're looking at whether the Special Master or Judge Liddell committed any error of law in the review and abuse of discretion. But if all the facts are undisputed, assume for the purpose of argument that there are no disputed facts, then the question is you take, often sets forth a legal test for proving causation. It has three parts. And if there's absolutely no dispute on the facts, and in case one, the facts come up, and the ruling is no causation, and in case two, the facts are exactly the same, and they come up and say causation. And my point being is that... You'd think that there has to be an error in applying the law to the facts. I do not, because I think that, you know, as a fact finder, I mean, there can be reasonable differences in terms of how they view the facts, reasonable differences in how they apply the law to the facts. And, you know, that's within the discretion of the fact finder here. And in this case... What, in a nutshell, are the differences in this case? The differences in this case, between this case and the Cleese case, are several. Number one, Dr. Steele, who was Petitioner's expert in both cases, was actually the treating physician for Mrs. Cleese. And as we know in the vaccine program under the law from this court, treating physician evidence is given some deference as being more important than typical expert testimony. The second point that is different between the Cleese case and this case, the Davis case, is the fact that several other treating physicians for Ms. Cleese also indicated that they felt that her NMO was caused by the flu vaccine. In addition, there were also, during the testimony in the Cleese case, Dr. — although this is not part of the record, and I'm not sure how far you want to go, but it is part of the decision. You probably understand. It's not in the record. Yeah. It is part of the decision that was filed with the court. So I think I can discuss it. The special master decision in this case was filed as an addition by the Petitioner. Dr. Steele admitted that his testimony in the Davis case was speculative and was conjectural, but a year had passed since the testimony. He said he had done some additional research in looking at the evidence and felt more comfortable in terms of giving his opinions, which is a big difference between this case and the Cleese case. The government's position and the government's reaction to the evidence was quite different in both cases as well, was it not? Actually, the government used the exact same expert witness in both cases as well. So in terms of the reaction by the government, the government did cross-examine in the Cleese case Dr. Steele. The government focused on, as I understand it, the second hit more so than the first hit. In the Cleese, that's correct. And in the Davis case focused more on the first hit, whether or not the flu vaccine can cause the damage to the endothelium. Are you sure? I'm pretty sure the government's experts were different people as between the two cases. I don't think so, Your Honor. I think they both were Dr. Steele and Dr. Belosky, if I'm not mistaken. Cleese was not my case, but I'm almost certain it was Dr. Belosky as well. I could look at the decision by Special Master Mailman. It would list it in there. But I think they were identical experts. But isn't it the case that Dr. Belosky in the Cleese case didn't agree that the antibodies caused the NMO? He focused his disagreement on the other prong of the two-hit theory as well. Basically, in the first case, in Davis, in this case, I thought that everybody agreed the antibodies caused the NMO, or at least there was no government expert testifying to the contrary, whereas in Cleese I interpreted the testimony that I read in the opinion as contradicting that theory. And that may be correct, Your Honor. I didn't get into the facts specifically in Cleese because I was more focused on this. But I did read Cleese to the extent that I tried to note the differences between the two cases, and I think I've said the differences between the two cases. Belosky was the expert for the respondent. Okay. Dr. Belosky was the expert for the respondent in both cases. Getting back to Petitioner. Can you help me out a little bit with a response to Ms. Chin-Kaplan's argument that if you clearly establish one of the criteria under Olson here, temporal relationship, the fact that you've established that gives you legs up for proof for satisfying one or more of the other Olson factors? Do you agree with that? Not necessarily as termed. I think that evidence clearly, for example, you can have a case that there's clearly temporal association. This Court has ruled that temporal association and no other cause doesn't get you past the three-prong test of the Olson Court. What does temporal relationship tell you other than the fact that there was a time between the moment of the vaccination and your injury? You can measure the number of days, hours, and months. I think it's more than just time. I think it's a medically approved or medically appropriate time under the Olson test. And so certainly there's a medical aspect of it as well. It's not just a time period, but there's a medical aspect of it. Obviously, evidence that can come in on one element can come in on all elements, but the fact that a petitioner has proven, for example, temporal association pronged through with Olson by very strong evidence doesn't necessarily mean that the evidence on prong one can be less than legally probable or legally persuasive. They still need to meet the elements in each of the three prongs of Olson by preponderant evidence. I have to go back because that's one more factual question to make sure I'm not crazy. I thought the government's expert in this case was Dr. Safran. Oh, I'm sorry. You keep telling me over and over it's the same person. My apologies, ma'am. I have Dr. Belosky on my mind because I have him in a hearing coming up next week. You're absolutely right, and my apologies. All right. Well, I just thought, my gosh, did I miss something entirely? I thought I read it closely. You did not. I just totally lost it there. Okay. I feel better now. And my apologies. Yes, it was Dr. Safran. Getting back, in terms of the second part, after dealing with the legal standard, looking at Daubert and the application of Daubert. Daubert is applied here correctly by the special master, as Judge Leteau indicated. This court has dealt with Daubert several times in terms of its application to the vaccine program, Cedillo being the most recent case, as well as in Moberly and Tarrant. The special master looked at all the factors. The special master did not require medical literature on the precise mechanism of injury, as stated in Petitioner's argument. But he wanted something reliable, something more than mere guesswork, something more than mere speculation or conjecture, as Dr. Steele indicated in this case. And Petitioner's, in this case, just didn't have that. They didn't meet the first-hit theory of showing any evidence that was reliable that somehow or another the flu vaccine could damage the endothelium. So you're relying pretty heavily on Dr. Steele's statement that there was some matter of conjecture here? That is one factor. Well, what I'm trying to do is to figure out what, I mean, was that a misstep? I mean, if he had not testified, did he just take that testimony out of the record? If you take that testimony out of the record, there are certainly plenty of other factors and points that the special master raised looking at everything, including the fact that there was no treating physician support for the theory, including looking at the Daubert factors, the fact that it's not a theory that's generally discussed among neurologists. Isn't the treating physician fact the most significant? It's certainly a factor. It's not the most significant, and we're talking about prong one. If we're focusing on prong one. He treated the treating physician factor as a dispositing fact in one case, I believe. That's correct, and I think the focus on the treating physician factor is more specific to prong two of all, and whether there's a logical sequence of cause and effect between the vaccine and the injury. But the special master didn't rely just on the testimony itself of Dr. Steele saying it was conjectural speculative. He relied on many other things. He looked at the literature that was filed by petitioners and found that none of it was reliable in support. Looked at many other things as well, including looking at Dr. Steele's methodology and conclusions, looking at whether there was any information from Japan where NMO was prevalent, the flu vaccine is prevalent, this issue is studied significantly, and yet there weren't even any case reports on this. Just in conclusion, special master here did consider all the relevant evidence and drew the plausible inferences from that evidence. Judge Leteau and the special master did not require a heightened burden of proof, did not require any direct proof, did not require any specific medical literature support or any specific scientific evidence. It was not the kind of evidence presented by the petitioner that concerned him. It was the quality of it. They required something, in this case, more than guesswork, but that's really all the petitioners presented here, and thus they both aptly found that the petitioners failed to meet their burden, and we would ask that you would affirm the decision of the CFC. Thank you. All right. Thank you very much. Ms. Chin Kaplan, any comments in rebuttal? Yes, Your Honor. Judge Moore asked what the difference was between Calise and Davis, and specifically in Calise – I'm sorry, in Davis, the special master there required objective, direct evidence from the medical literature of how the flu vaccine led to damage in the endothelium. In Calise, the special master there applied the Alton prongs. She looked at whether there was a theory which was medically plausible and whether there was a logical sequence of cause and effect and whether the temporal relationship was appropriate, and then she determined that by preponderance of the record as a whole that a petitioner had submitted sufficient evidence in Calise, whereas here the overriding factor seems to be the lack of a specific article which supports that the flu vaccine can lead to damage in the endothelium, exposing the AQP4 protein, which is the target molecule for the antibody here. And that, Your Honor, is precisely the reason why we have different outcomes here. In the Davis case, we did have a heightened burden of proof, whereas in the Calise case she applied what is the standard issued by this Court. Is the difference a heightened burden of proof or is the difference a substantially different record? I don't believe it's a substantially different record. If one looks at the hearing transcript from Calise, what Dr. Steele did indicate was that, yes, he had an additional year to study it, but his testimony didn't change. It just substantiated in his mind what the mechanism of injury was. And the evidence was based on essentially virtually the identical literature. But from the government's point of view, his opinion changed because it went from a conjecture to a certainty. The additional information that he acquired in the ensuing years says, hmm, my conjecture was correct. He said it was not at all speculative. Right. So, I mean, it's science. You have a guess at point one. Proving your guess was right at point two. I think that's the way the government sees what happened here. I understand what you're saying, Your Honor. In Davis, doctors would hate it if you said that they'd guess. They draw logical inferences from the medical information that's contained before them. And in the years subsequent to the Davis hearing, Dr. Steele did indeed go back and study underlying immunology, and as he indicated, from the medical school standpoint. So while it substantiated his opinion, it cemented his opinion, his opinion did not change. Thank you. All right. I thank both counsel. The case is submitted.